# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CHARLES L. JONES,** | |
| Petitioner, | |
| v. | Case No. 12-3055-JAR |
| **REX PRYOR, ET AL.,** | |
| Respondents. | |

## MEMORANDUM AND ORDER

After the Tenth Circuit reversed and remanded this case for an evidentiary hearing to determine whether Petitioner's federal habeas petition was timely filed, the parties submitted a joint proposal (Doc. 51) that the Court approved (Doc. 54). In exchange for Petitioner's consolidation and narrowing of his federal habeas claims, Respondents agreed to waive the statute of limitation defense, obviating the need for an evidentiary hearing on that issue. The parties also agreed to bifurcate briefing as follows: 1) claims that the parties agreed could be decided on the existing record, and 2) claims that may require factual development or an evidentiary hearing.

The parties have fully briefed the existing record claims and the Court is prepared to rule.[1] These claims attack Petitioner's life sentence, alleging: 1) ineffective assistance of counsel during the juvenile waiver hearing entitling Petitioner to a presumption of prejudice under *United State v. Cronic*[2] (Claim 3); 2) a Sixth Amendment violation based on the failure to notify Petitioner and his parents of their right to employ counsel of their choice (Claims 1 and 4); and

---

[1] *See* Petitioner's Supplemental Brief in Support of 28 U.S.C. § 2254 Petition (Doc. 58), Respondents' Answer and Return (Doc. 64), Petitioner's Reply (Doc. 67), and Respondents' Surrebuttal (Doc. 70).

[2] 466 U.S. 648 (1984).

3) an *Apprendi*[3] violation due to the juvenile court's decision to authorize prosecution of Petitioner as an adult (Claim 5). For the reasons set forth below, the Court denies federal habeas relief on these claims.

I.   **Factual Background**

In July of 1998, Petitioner Charles Jones was 16 years old and had two theft adjudications for joyriding. The Kansas Supreme Court summarized the facts for the July 21, 1998, shooting death of Robert Trzok as follows in *State v. Jones*[4]:

> Facts
> The State's theory at trial was that Jones had been robbed and injured by Trzok prior to the shooting. After identifying Trzok's parked car, Jones and his friend LaKevis Tensley entered the house where Trzok and four others, Jeffrey Fields, Ronald Haskins, S.W., and E.G., were drinking and consuming drugs. Jones and Tensley beat Trzok and drug him out of the house and onto the front porch where Jones shot Trzok three times in the back of the head.
>
> Motive Evidence
> Tracy Thomas, an emergency room nurse, testified that days prior to the shooting death of Trzok, she treated a male, who identified himself as Santos Metcalf, for a serious mouth laceration. The person purporting to be Santos Metcalf explained he was hurt by riding his bicycle into a clothes line. A doctor sutured the person's mouth and sent him home. Sandra Metcalf, Jones' cousin, testified that Santos Metcalf is her brother and that he had never had a laceration to his mouth. She testified it actually was Jones who had suffered the injury to his mouth.
>
> LaKevis Tensley
> Tensley testified regarding the events of July 21, 1998. Tensley was driving when he saw Jones walking and picked up Jones. They continued to ride around getting high by smoking marijuana. Tensley observed injuries to Jones mouth, which Tensley believed occurred while someone tried to rob Jones. Jones spotted the car belonging to the man who robbed him. Tensley testified he believed Jones merely wanted to beat the guy who had robbed him. Tensley and Jones carried guns as they walked to the house.
>
> Jones entered the house first. By the time Tensley entered the house, Jones was already talking to Trzok. Both Tensley and Jones were wearing bandannas to conceal their identity. Jones asked Trzok to come outside and when Trzok

---

[3] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

[4] 47 P.3d 783, 786–88 (Kan. 2002).

refused, Tensley struck Trzok in the face and kicked Trzok before dragging Trzok out of the house. According to Tensley, when he reached the outside of the house he began running to his car. It was not until Tensley was running to his car that he heard shots. Tensley and Jones left in Tensley's car. Tensley dropped Jones off at his grandmother's house.

Jeffrey Fields
Fields testified that he had known Trzok for a few months before Trzok's murder. On the day of the murder, Trzok drove his own car to Fields' house, arriving at 9 a.m. Fields and Trzok began smoking crack cocaine at that time. E.G., S.W., and Haskins all arrived later. Those at the house drank alcohol and consumed crack cocaine and marijuana. According to Fields, Trzok purchased most of the crack, spending between $700 to $1,000.

Late in the evening, Haskins unlocked the front door and permitted two people to enter. Fields testified Jones entered first, and then a second person entered sometime thereafter. Fields testified he did not recognize Jones at first as one of the intruders, but said he had recognized him as someone whom he had seen previously in the neighborhood. Fields said Jones and Tensley wore bandannas over their faces. Trzok did not want to go outside with Jones and Tensley. Fields told Trzok to get up and go outside to take care of his business with Jones and Tensley because Fields did not "like confusion inside [his] home." Fields confirmed there was a struggle to get Trzok outside. Fields noticed Jones had a gun which looked like a revolver. When Jones and Tensley dragged Trzok out of the house, Fields shut and locked the door. Fields observed Jones bend down to shoot Trzok.

Later, during an interview at the police department, Fields identified Jones from a lineup as the man who shot Trzok. Fields denied that he, Haskins, S.W., or E.G. had anything to do with Trzok's murder.

Ronald J. Haskins, Sr.
Haskins, who is Fields' uncle, arrived at Fields' house around noon the day of Trzok's murder. Haskins confirmed that he drank alcohol and got high while at Fields' house. According to Haskins, he heard a knock, saw Jones outside, and yelled out to Fields to announce Jones' presence. Fields authorized Haskins to unlock the door for Jones. Haskins identified Jones as the person standing on the porch. Although Jones put on a bandanna when he entered the house, Jones was not wearing the bandanna when Haskins saw him standing outside the house. Haskins testified that Jones entered the house and told Trzok to leave the house. Haskins confirmed that a second man then entered the house and both Tensley and Jones beat Trzok and drug him outside. After Jones and Tensley dragged Trzok outside, Haskins heard gunshots. Haskins also picked Jones out of a photo lineup.

S.W. and E.G.
S.W.'s testimony was consistent with Fields and Haskins regarding the events on the evening of the murder, but S.W. could not identify either of the intruders. E.G. also testified at trial. E.G.'s testimony confirmed the events leading up Trzok's murder. E.G. identified Jones as the first of the two intruders.

Investigation of Scene
Dr. Erik Mitchell, a forensic pathologist, performed the autopsy identifying three gunshot wounds to the back of Trzok's head. Trzok had cocaine, but no alcohol, in his blood at the time of his death. Dr. Mitchell also identified numerous other injuries to Trzok's shoulder, left arm, back of right hand, back of right elbow, and left lower back. The cause of death was the gunshots wounds to the head.

Don Garrett, a police officer, testified that he recovered three bullets from the scene: two were under Trzok's head and another lodged in the house next door. Dr. Mitchell removed a fourth bullet from Trzok's body.

William Newhouse, the chief criminalist with the firearms and toolmark section with the police department, analyzed the bullets from the scene. Newhouse testified the bullets were fired from the same gun, which had to be a .38/.357 caliber weapon.

Sophia Barajas, a police officer, testified she was immediately dispatched to the scene after shots were reported. Officer Barajas testified the red car parked in front of Fields' house belonged to Trzok.

Jones' Flight to Iowa
Jones' cousin Metcalf testified that Jones stayed with her on Wednesday night, which was the night after the murder. On Thursday evening, Metcalf and her boyfriend drove Jones to Des Moines, arriving early Friday morning. Metcalf and her boyfriend dropped Jones off at his mother's apartment.

Greg Trimble, an officer with the Des Moines police department, testified that he was called on Friday to help the Federal Bureau of Investigation in finding Jones. Officer Trimble arrested Jones. According to Officer Trimble, Jones continually questioned Officer Trimble about the purpose for the arrest. Upon learning of the allegations, Jones denied being responsible for any murder; however, his denial assumed that the murder was committed with a gun, a fact that had not been revealed to Jones.

Jan Bjurstrom, an officer with the Des Moines police department, testified that she noticed blood on Jones' shoe. Jones explained it was blood from his mouth injury. Officer Bjurstrom seized the shoes and gave them to Kansas detectives who had come to Des Moines to interview Jones.

DNA Evidence
Linda Netzel, a senior criminalist with the Kansas City, Missouri police department, testified about the DNA analysis of blood extracted from Jones' shoe. Netzel testified the blood on Jones' shoe matched Trzok's blood. Further, Netzel excluded Jones' own blood from possibly matching the stain. Netzel testified there was a 1 in 32 million chance of finding another person with DNA also matching the stain. Netzel also testified about a phenomenon in DNA analysis known as spillover, which could potentially render the test invalid. However, Netzel testified that spillover was not possible in her analysis.

## II. Procedural History

The State filed a Complaint for First Degree Murder and Aggravated Battery against Petitioner on July 24, 1998.[5] Law enforcement arrested Petitioner in Iowa. Petitioner signed a Waiver of Extradition and was extradited to Kansas on or about July 27, 1998.[6] A warrant hearing was held on July 29, 1998, and a detention hearing was set for the next day.[7]

On July 30, 1998, the juvenile court ordered Petitioner detained pending a waiver hearing.[8] That same day, the State filed a motion requesting authorization to prosecute Petitioner as an adult.[9] On September 3, 1998, the juvenile court certified Petitioner for adult prosecution.[10]

On January 31, 2000, a jury found Petitioner guilty of one count of First Degree Premeditated Murder.[11] On March 17, 2000, the trial court sentenced him to life imprisonment, with the possibility of parole after 25 years.[12] Petitioner filed a direct appeal, arguing, *inter alia*, that: 1) adult certification without sufficient notice to his parents violated the due process clause,

---

[5] Transcript of Record (Vol. I) at 17, Complaint.

[6] Transcript of Record (Vol. II) at 206, Tr. of 60-1507 Hr'g at 25:12-18.

[7] Transcript of Record (Vol. I) at 14, Juvenile Appearance Docket.

[8] *Id.* at 15, Trial Docket.

[9] *Id.* at 26–28, Mot. Requesting Authorization for Adult Prosecution.

[10] *Id.* at 31–33, Order Authorizing Prosecution as an Adult.

[11] *Id.* at 64, Verdict.

[12] *Id.* at 65–67, Kansas Sentencing Guidelines Journal Entry of Judgment.

2) the juvenile court erred by failing to consider the eight factors mandated in K.S.A. 38-1636(e) in authorizing adult prosecution; and 3) increasing the penalty he faced by prosecuting him as an adult was an illegal upward departure under *Apprendi v. New Jersey*.[13] The Kansas Supreme Court affirmed Petitioner's conviction and sentence.[14] The United States Supreme Court denied certiorari on October 21, 2002.[15]

On July 9, 2004, Petitioner filed a motion for post-conviction relief pursuant to K.S.A. 60-1507 ("the 1507 Motion"). In this motion, Petitioner argued, *inter alia*, that manifest injustice resulted because he was denied effective assistance of counsel at the waiver hearing.[16] Petitioner argued that his counsel's performance at that hearing fell below an objective standard of reasonableness and that he suffered prejudice as a result of counsel's many failures. The district court denied the motion as untimely. Petitioner appealed. On September 30, 2005, the Kansas Court of Appeals reversed the district court's denial and remanded the case for further proceedings.[17] On remand, after an evidentiary hearing, the District Court of Wyandotte County denied Petitioner's 1507 Motion, finding in pertinent part:

> Petitioner's contention that his representation by Sean (sic) DeGraff at the hearing to determine if he should be tried as an adult is reviewed using the two-prong test set forth in *Chamberlain v. State*, 236 Kan. 650, 694 P .2d 468 (1985). The Court finds that even if Mr. DeGraff's representation of the petitioner fell below an objective standard of reasonableness as dictated by the first prong, there is not a reasonable probability that the results of the proceeding would have been different but for any errors of counsel.[18]

The Kansas Court of Appeals affirmed that denial with the following analysis:

---

[13] 530 U.S. 466 (2000).

[14] Transcript of Record (Vol. I) at 136–55, *State v. Jones*, 47 P.3d 783 (Kan. 2002).

[15] *Jones v. Kansas*, 123 S. Ct. 444 (Oct. 21, 2002).

[16] Transcript of Record (Vol. II) at 157, Petition for Writ of Habeas Corpus Pursuant to K.S.A. § 60-1507 at 2.

[17] *Jones v. State*, No. 93,239, 2005 WL 2416069 (Kan. Ct. App. Sept. 30, 2005).

[18] Transcript of Record (Vol. II) at 179–81, Journal Entry (Denying Habeas Relief).

> The severity of the crime, the violent manner in which the crime was committed, the fact that the crime resulted in the victim's death, and Jones' criminal history, which included two theft convictions, all weighed against trying Jones as a juvenile. Jones had the burden to rebut the presumption, and the only factors that could have weighed in his favor were factors six, seven, and eight. However, Jones was charged with first-degree murder. There was evidence of premeditation. Jones had prior felony theft and misdemeanor theft convictions, in which he was tried as a juvenile. The facts also show that this was a particularly brutal murder. Jones and a friend dragged Trzok out of the house, beat him, and then Jones shot him three times in the back of the head.
>
> The factors that weighed against allowing Jones to proceed as a juvenile were so great that there is no reasonable probability that evidence [of] his maturity or sophistication would have outweighed the other factors. Jones has failed to establish that his counsel's deficient performance prejudiced his defense. The district court did not err by denying Jones' claim of ineffective assistance of counsel.[19]

The Kansas Supreme Court denied review of the Court of Appeals' decision affirming the denial of the 1507 motion.

On June 23, 2009, Petitioner filed a motion to correct illegal sentence in the District Court of Wyandotte County, alleging fatal defects at various proceedings, including: 1) lack of notice to his parents regarding the juvenile waiver hearing, 2) an erroneous determination that waiver counsel's deficient performance was harmless; and 3) lack of notice regarding the right to retain counsel of choice.[20] The state district court summarily denied the motion as a second or successive 1507-motion.[21] Petitioner appealed and the Kansas Supreme Court affirmed the denial of Petitioner's motion to correct illegal sentence.[22] Petitioner filed for a Writ of Certiorari in the United States Supreme Court, which was denied.[23]

---

[19] *Jones v. State*, No. 99,370, 2009 WL 863106, at *4 (Kan. Ct. App. Mar. 27, 2009).

[20] Transcript of Record (Vol. III) at 307–13, Mot. to Correct Illegal Sentence Pursuant to K.S.A. 22-3504(1).

[21] *Id.* at 314, Letter Order.

[22] *State v. Jones*, 257 P.3d 268 (Kan. 2011).

[23] *Jones v. Kansas*, 132 S. Ct. 1097 (2012).

On November 1, 2012, Petitioner filed a second motion to correct illegal sentence in the District Court of Wyandotte County, arguing he was denied the following: 1) effective assistance of counsel due to a complete breakdown of communication with his attorney resulting from his juvenile personality disorder; 2) effective assistance of counsel because his attorney failed to request a competency hearing to determine if he was suffering from a juvenile personality disorder; and 3) due process because he was convicted while mentally incompetent.[24] The district court summarily denied the second motion, Petitioner appealed, the Kansas Court of Appeals affirmed, and the Kansas Supreme Court denied review of the Kansas Court of Appeals' decision.[25]

On February 27, 2012, Petitioner filed a petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of Kansas. Judge Crow of this Court dismissed Petitioner's habeas corpus petition as time-barred.[26] Petitioner appealed. The Tenth Circuit reversed and remanded for an evidentiary hearing to determine whether Petitioners' federal habeas corpus petition was timely filed.[27]

Pursuant to the parties' joint proposal, Respondents have waived the statute of limitations defense in exchange for Petitioner's consolidation and narrowing of his federal habeas claims. Additionally, the parties agreed to bifurcate briefing as follows: 1) claims that the parties agreed could be decided on the existing record, and 2) claims that may require factual development or

---

[24] *Jones v. State*, No. 109,713, 2014 WL 1363267, at *2 (Kan. Ct. App. Apr. 14, 2014), *review denied* (Kan. Mar. 12, 2015).

[25] *Id.*

[26] Doc. 21.

[27] *Jones v. Heimgartner*, 602 F. App'x. 705 (10th Cir. 2015).

an evidentiary hearing. The parties have completed the first round of briefing and the Court is prepared to rule on the claims that may be decided on the existing record.[28]

III. **Federal Habeas Standards**

   *A. Generally*

A federal court reviews a state prisoner's challenge to matters decided in state court proceedings pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which "requires federal courts to give significant deference to state court decisions" on the merits.[29] A federal court may not grant a state prisoner habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the prisoner can show that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[30] Clearly established law refers to the Supreme Court's holdings, as opposed to its dicta.[31] A state court decision is "contrary to" the Supreme Court's clearly established precedent "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts."[32] "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in state court and based on a factual determination will not be

---

[28] Pursuant to Rule 8(a) of the Rules Governing Section 2254 Cases, the Court must determine whether an evidentiary hearing is warranted. The Court finds an evidentiary hearing unnecessary for these claims. *Anderson v. Attorney Gen. of Kan.*, 425 F.3d 853, 859 (10th Cir. 2005) ("[A]n evidentiary hearing is unnecessary if the claim can be resolved on the record.").

[29] *Lockett v. Trammel*, 711 F.3d 1218, 1230 (10th Cir. 2013).

[30] 28 U.S.C. § 2254(d)(1).

[31] *Lockett*, 711 F.3d at 1231.

[32] *Bell v. Cone*, 535 U.S. 685, 694 (2002).

overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."[33]

### B. Exhaustion and Procedural Default

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted the available state court remedies.[34] Under the exhaustion doctrine, "[a petitioner] must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."[35] "[A]ny claims not included in a petition for discretionary review are unexhausted."[36] Ordinarily, when a petitioner does not bring claims to the state's highest court, a claim is unexhausted.[37] However, if a petitioner's claims are barred under state law and it is too late to pursue relief in state court, a claim will be deemed exhausted because there are no state remedies available to the petitioner.[38]

Even where the claim is considered exhausted because there are no state remedies available, the claim may be subject to dismissal for procedural default.[39] For the court to review a claim that has been procedurally defaulted, the petitioner must: 1) allege sufficient cause for failing to raise the claim and resulting prejudice, or 2) demonstrate that the failure to consider the procedurally defaulted claim will result in a fundamental miscarriage of justice because the petitioner made a credible showing of actual innocence.[40] "Cause" requires the petitioner show

---

[33] *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

[34] 28 U.S.C. § 2254(b)(1); *Frost v. Pryor*, 749 F.3d 1212, 1231 (10th Cir. 2014).

[35] *Frost*, 749 F.3d at 1231.

[36] *Id.*

[37] *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

[38] *Verlarde v. Archuleta*, 740 F. App'x. 740, 744 (10th Cir. 2016) (citing *Gray v. Netherland*, 518 U.S. 152, 161 (1996)); *Coleman*, 501 U.S. at 732.

[39] *Frost*, 749 F.3d at 1231 (quoting *Coleman*, 501 U.S. at 735 n.1).

[40] *Id.* (citations omitted).

that some objective external factor impeded efforts to comply with state procedural rules.[41] "Prejudice" requires the petitioner to demonstrate "actual prejudice as a result of the alleged violation of federal law."[42]

## IV. Analysis

### A. *Ineffective Assistance of Counsel at the Juvenile Waiver Hearing and the Cronic Exception (Claim 3)*

Claim 3 asserts Petitioner is entitled to federal habeas relief because the state court failed to apply the *Cronic*[43] exception to his ineffective assistance of counsel claim against Shawn DeGraff, Petitioner's counsel at the juvenile waiver hearing. In *Cronic*, the Supreme Court held that there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."[44] In these limited circumstances, prejudice is presumed "without inquiry into counsel's actual performance at trial."[45] Petitioner argues that because DeGraff made no effort to adequately represent him at the waiver hearing, the state court erred in denying his ineffective assistance of counsel claim based on his failure to establish DeGraff's performance prejudiced his defense. Petitioner argues that under *Cronic*, due to DeGraff's complete abdication of his advocacy role, prejudice is presumed.

Respondents counter that Petitioner never raised a *Cronic*-based claim before the state courts, thus this claim is unexhausted and procedurally defaulted. Petitioner argues that although he may not have uttered the magic word "*Cronic*," his allegations and the evidence he presented offered the Kansas courts a fair opportunity to grant relief under *Cronic*. And even if this claim

---

[41] *Spears v. Mullin*, 343 F.3d 1215, 1255 (10th Cir. 2003) (citing *Coleman*, 501 U.S. at 750).

[42] *Fairchild v. Trammel*, 784 F.3d 702, 719 (10th Cir. 2015) (quoting *Coleman*, 501 U.S. at 750).

[43] *United States v. Cronic*, 466 U.S. 648 (1998).

[44] *Id.* at 658.

[45] *Id.* at 662.

11

was not exhausted and was procedurally defaulted, he can overcome the default by showing cause and actual prejudice.

On the record before it, the Court cannot say that Petitioner fairly presented a *Cronic*-based claim to the state courts. Petitioner's 1507 Motion alleged DeGraff's performance fell below an objective standard of reasonableness and that Petitioner suffered prejudice as a result of his counsel's failures.[46] Petitioner's 1507-appellate brief also argued both deficient performance and resulting prejudice.[47] Thus, Petitioner presented a traditional claim of ineffective assistance of counsel under the *Strickland* standard. At no time did Petitioner reference *Cronic*, and more importantly, he never argued that prejudice could be or should be presumed, or that he did not have to prove prejudice under the circumstances. Instead, Petitioner conclusorily argued that he had been prejudiced. Because the Sixth Amendment encompasses various violations, referencing the Sixth Amendment did not alert the state court that Petitioner was invoking a *Cronic*-based claim. Certainly the Kansas Court of Appeals could have *sua sponte* raised *Cronic*, but courts are not required to craft arguments for parties.[48] The Court finds that Petitioner did not exhaust Claim 3. However, because it is now too late to bring a *Cronic*-based claim in state court, Petitioner meets the technical requirements for exhaustion. Petitioner, nonetheless, procedurally defaulted Claim 3.[49]

---

[46] Transcript of Record (Vol. II) at 157, Petition for Writ of Habeas Corpus Pursuant to K.S.A. § 60-1507 at 2.

[47] Transcript of Record (Vol. II) at 26165, No. 99,370, Br. of Appellant at 7–11.

[48] *Lebahn v. Owens*, 813 F.3d 1300, 1307–08 (10th Cir. 2016) (explaining that it is not the court's job to make or craft arguments for parties).

[49] *State v. Neer*, 795 P.2d 362, 365–66 (Kan. 1990) ("[T]hose issues that could have been presented [on appeal], but were not presented are deemed waived.); *see also Petsche v. Tafoya*, 146 F. App'x. 306, 314 (10th Cir. 2005) (finding *Cronic* claim not properly presented on federal habeas appeal because petitioner had presented conflict of interest ineffective assistance claim in state court).

Petitioner claims his state postconviction counsel, Philip Sedgwick and Charles Ball, caused the default because they should have recognized the *Cronic* nature of his Sixth Amendment claim and should have invoked *Cronic*, a decision that was issued on the same day as *Strickland*. Petitioner, however, did not present this ineffective assistance claim against postconviction counsel to the state courts. In other words, Petitioner also defaulted that claim.

In *Edwards v. Carpenter*,[50] the Supreme Court held that a procedurally defaulted ineffective assistance of counsel claim cannot serve as cause to excuse the procedural default of another habeas claim. Petitioner argues that his failure to raise ineffectiveness of postconviction counsel should be overlooked under *Martinez v. Ryan*[51] and *Trevino v. Thaler*.[52] If *Martinez/Trevino* applied, Petitioner must first establish postconviction counsel's ineffectiveness under the *Strickland* test and that the underlying defaulted claim was substantial.[53] The current record, however, does not establish that Petitioner's postconviction counsel were deficient. Petitioner's brief does nothing more than observe that postconviction counsel did not raise his now barred *Cronic*-claim. The record does not disclose whether postconviction counsel strategically chose not to argue *Cronic* or was simply negligent. Under traditional *Strickland* principles, Petitioner has not made an adequate showing that postconviction counsel performed deficiently.

Nor has Petitioner shown that his *Cronic* claim against DeGraff was substantial. Undoubtedly, DeGraff's performance was deficient. DeGraff first met with Petitioner for 2 to 3 minutes, approximately 15 minutes before the waiver hearing. This showed that DeGraff failed

---

[50] 529 U.S. 446 (2000).

[51] 566 U.S. 1 (2012).

[52] 133 S. Ct. 1911 (2013).

[53] *Martinez*, 566 U.S. at 1718; *Trevino*, 133 S. Ct. at 1921.

to investigate waiver factors 6, 7, and 8, and failed to procure any witnesses. Despite this, it is far from clear that a *Cronic*-claim would have succeeded had it been raised during the 1507 proceeding. First, the Court sees nothing wrong with DeGraff confirming uncontrovertable facts such as Petitioner's date of birth and his prior theft adjudications. Second, the Kansas Court of Appeals did not specifically find that DeGraff completely abdicated his duty and that there was a complete breakdown in the adversarial process. DeGraff did what most attorneys do when the facts are against your client, he made a procedural argument. Third, waiver hearings are atypical in the criminal process because in certain cases, as was the case here, the defendant bears the burden of proof.

> While a waiver hearing involves a substantial right subject to the requirements of due process, it is not adjudicatory in nature in that it does not result in any determination of guilt or innocence or in confinement or punishment. It is merely a preliminary process to determine the type of adjudicatory procedure to be carried out at a later date. The only decision is dispositional in that the court determines whether further proceedings will be under the juvenile offenders code or under the Kansas criminal code.[54]

Because adult certification proceedings do not bear on the question of guilt or innocence, the State only needed to present court documents to shift the burden to Petitioner to prove he should not be tried as an adult. More importantly, as the state courts noted, there was nothing DeGraff could have presented regarding Petitioner's maturity and sophistication that could overcome the presumption of waiver given he participated in a premeditated, execution-style murder. Petitioner points to nothing in the state record nor does he proffer any arguments to suggest that he could indeed overcome the presumption of waiver.

On the current record, Petitioner has failed to show cause for the double default. The Court therefore finds Claim 3 procedurally barred, and not subject to review by this Court. But,

---

[54] *State v. Muhammad*, 703 P.2d 835, 839–40 (Kan. 1985)

even if the claim is not procedurally barred, under these circumstances, the Court finds the state court's decision to apply the *Strickland* test not contrary to Supreme Court precedent. Applying a *Cronic*-presumption of prejudice under these circumstances would promote an anomalous result — treating Petitioner as a juvenile, while treating a defendant that had effective counsel as an adult. For these reasons, the Court denies Petitioner's claim for relief stemming from the state court's determination that DeGraff's deficient performance was harmless.

### B. Right to Counsel of Choice (Claims 1 and 4)

Claims 1 and 4 raise a Sixth Amendment violation based on the state district court's failure to inform Petitioner of his right to counsel of choice at the juvenile waiver hearing. Petitioner claims that his parents were not provided written notice that they had a right to hire a lawyer and so he was not afforded a meaningful opportunity to secure counsel of his choice. Respondents argue that Claims 1 and 4 are unexhausted, procedurally defaulted, and meritless.

Rather than delve into the complex analysis of whether a procedural bar should be applied to these claims, the Court will take the simpler path and deny Petitioner relief on the merits.[55] First, to the extent that Petitioner argues that his rights were violated under Kansas law, federal courts will not grant habeas relief to correct errors of state law.[56]

Second, while the right to select and be represented by one's preferred attorney is covered by the Sixth Amendment, the right to counsel of choice does not extend to defendants who require counsel to be appointed for them.[57] A defendant may not insist on representation by

---

[55] *Snow v. Sirmons*, 474 F.3d 693, 717 (10th Cir. 2007) ("[Courts] can avoid deciding procedural bar questions where claims can readily be dismissed on the merits.").

[56] *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that habeas relief will not lie to correct errors in interpretation or application of state law).

[57] *United States v. Gonzalez-Lopez,* 548 U.S. 140, 151 (2006).

15

an attorney he cannot afford.[58] The record reflects that the state courts appointed counsel for Petitioner. Nothing in the record indicates Petitioner was anything but indigent. Automatic reversal for a violation of the right to counsel of choice is limited to cases where the trial court unreasonably or arbitrarily interfered with a defendant's right to counsel of choice.[59] Here, at no time did Petitioner request a continuance to hire or retain his own counsel to contest the waiver to adult prosecution. Nothing in the record indicates that Petitioner or his parents desired to hire counsel of choice or had the means to do so; nor did able counsel appear as in the *Powell*[60] case to offer assistance. Accordingly, the state district court did not arbitrarily interfere with Petitioner's right to counsel of choice.

Finally, to the extent these claims are interrelated with the lack of notice claim raised on direct appeal, the Court finds the state court's analysis regarding the sufficiency of the notice given to Petitioner at the juvenile waiver hearing not contrary to clearly established Supreme Court law.[61] As the Kansas Supreme Court noted, *Kent v. United States*,[62] rather than *In re Gault*,[63] controls and defines Petitioner's due process rights in the juvenile waiver proceeding.[64] Because the waiver hearing was not adjudicatory in nature, and did not result in any determination of guilt or innocence or in the confinement or punishment, the Court finds the Kansas Supreme Court applied a legal standard consistent with Supreme Court precedent and

---

[58] *Wheat v. United States*, 486 U.S. 153, 159 (1988).

[59] *United States v. Mendoza–Salgado*, 964 F.2d 993, 1016 (10th Cir.1992) (explaining that automatic reversal is limited to cases where the trial court unreasonably or arbitrarily interfered with a defendant's right to counsel of choice).

[60] *Powell v. Alabama*, 287 U.S. 45 (1932).

[61] *State v. Jones*, 47 P.3d at 789–91; *State v. Jones*, 257 P.3d at 271–72.

[62] 383 U.S. 541 (1966).

[63] 387 U.S. 1 (1967).

[64] *State v. Jones*, 257 P.3d at 272.

applied it in an objectively reasonable manner. Thus, Claims 1 and 4 provide no basis for habeas relief.

### C. Certification for Adult Prosecution and Apprendi (Claim 5)

Claim 5 asserts an *Apprendi* violation. In *Apprendi v. New Jersey*,[65] the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[66] On direct appeal, Petitioner argued that when the state judge, rather than a jury, made factual findings certifying Petitioner as an adult, it exposed him to an increased sentencing range — from a maximum of 7 years to life — and violated the Sixth and Fourteenth Amendments as set out in *Apprendi*. The Kansas Supreme Court held that *Apprendi* did not apply to juvenile waivers because the juvenile system is different.[67]

As Petitioner readily admits, the Tenth Circuit rejected a similar argument in *Gonzalez v. Tafaya*.[68] The Court declines Petitioner's invitation to reverse the Tenth Circuit's *Gonzalez* decision. Bound by Tenth Circuit precedent, the Court concludes that the Kansas Supreme Court's determination that *Apprendi* does not apply to juvenile waiver proceeding was neither contrary to, nor an unreasonable application of Supreme Court precedent. Thus, Claim 5 provides no basis for habeas relief.

**IT IS THEREFORE ORDERED BY THE COURT** that Claims 1, 3, 4, and 5 are **DENIED.**

---

[65] 530 U.S. 466 (2000).

[66] *Id*. at 490.

[67] *Jones*, 47 P.3d at 793–98.

[68] 515 F.3d 1097 (10th Cir. 2008).

**IT IS FURTHER ORDERED** that the parties shall confer and submit a joint briefing schedule for the remaining habeas claims within 14 days of the date of this Order.[69]

**IT IS SO ORDERED.**

Dated: June 7, 2017

                S/ Julie A. Robinson
                JULIE A. ROBINSON
                UNITED STATES DISTRICT JUDGE

---

[69] Because claims remain pending, the Court need not decide whether to issue or deny a certificate of appealability at this time. Rule 11(a) of the Rules Governing Section 2254 Cases ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").